457 S.E.2d 652

OFFICE OF DISCIPLINARY COUNSEL, Petitioner,

v.

Geary M. BATTISTELLI, a Member of the Lawyer Disciplinary Board, Respondent.

No. 22472.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 12, 1994.

Decided April 14, 1995.

suspends the Respondent's law license pending the outcome of the ongoing disciplinary proceedings.

Teresa A. Tarr, Disciplinary Counsel, for petitioner.

Michael C. Allen, Charleston, for respondent.

WORKMAN, Justice:

## I.

■ The Petitioner, the Office of Disciplinary Counsel of the Lawyer Disciplinary Board, prays that this Court temporarily suspend the law license of the Respondent, Geary M. Battistelli, pursuant to Rule 3.27, West Virginia Rules of Lawyer Disciplinary Procedure (hereinafter "Disciplinary Rule 3.27"). After carefully reviewing the briefs and the record, the Court believes that if the charges against the Respondent are ultimately proven, they will establish that he has engaged in an unprecedented and continuing pattern of inappropriate conduct meriting a serious sanction. Given this, and the real threat that the Respondent poses to the public as a result, the Court hereby temporarily

## II.

The Petitioner claims in its "Petition for Extraordinary Relief" that it has received twenty-five legal ethics complaints against the Respondent since 1986. At the time that this case was submitted to the Court, the Petitioner asserted that ten of the twenty-five complaints were currently open and were either presently under investigation or before the Hearing Panel of the Lawyer Disciplinary Board.[1] Five of the twenty-six complaints have resulted in action being taken against the Respondent.[2] The remaining ten complaints were dismissed either because (1) the evidence was insufficient to establish a violation of the West Virginia Rules of Professional Conduct, or (2) the evidence showed that the Respondent had not violated those Rules.[3]

Subsequent to submitting this case, the Petitioner filed a ten-count "Statement of Charges" against the Respondent on November 18, 1994. Most of the counts contained in the Statement were previously discussed

1. It appears that there were eleven rather than ten pending matters, thus bringing the total number of complaints to twenty-six.

2. One complaint was the subject of this Court's opinion in *Committee on Legal Ethics v. Battistelli,* 185 W.Va. 109, 405 S.E.2d 242 (1991), in which the Respondent was fined for misrepresenting facts before the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit stated that the Respondent "misstated the record both in his brief and in oral argument in an attempt to mislead this court...." *Holcomb v. Colony Bay Coal Co.,* 852 F.2d 792, 797 (4th Cir.1988).

The second complaint arose from the Respondent's mailing of an abusive letter to a potential defendant in a wrongful death action. While the Investigative Panel concluded that the letter was "reprehensible," the case was closed after the panel directed Bar Counsel to issue a letter of admonishment to the Respondent.

In the third complaint, the Respondent was charged with negligently handling a divorce and failing to properly deal with an escrow account. He was also charged with making sexual advances to his client and ultimately having a sexual relationship with her. The Investigative Panel found no evidence that the Respondent's repre-

sentation of his client was inadequate. On the sexual relationship issue, the panel said that it did "not believe that a hearing would be in either of the parties' best interests" and admonished the Respondent to refrain from this conduct in the future.

The fourth complaint charged that the Respondent had been derelict in handling a DUI case and a child custody matter. The complaint also charged him with failing to return the unearned portion of a fee promptly. The neglect allegations were never developed. The fee matter was mediated, and the panel, in essence, concluded that the issue had been resolved. To the extent the neglect allegations were true, the Panel "urge[d]" the Respondent to comply with the diligence requirements contained in the West Virginia Rules of Professional Conduct. The matter was then closed.

In the fifth case, the Respondent was admonished and cautioned by the Investigative Panel for making misrepresentations to the Circuit Court of Marshall County and for certain other dilatory actions taken in representing a client.

3. We need not recount the details of these dismissed complaints herein. We will refer to them, however, where they are relevant to our analysis.

in, and pending at the time of, the Petition. Some of the counts, however, allege new charges.[4] Interestingly, the Respondent freely admits that he has been the subject of numerous complaints, blaming personal difficulties.

The briefs and record reveal that of the eleven matters that were pending at the time of submission, three were before the Hearing Panel of the Lawyer Disciplinary Board. The first complaint before the Hearing Panel (I.D. 94–03–002) charges that Mr. Battistelli lied to Chief Disciplinary Counsel Sherri Goodman in relation to a real estate transaction involving a Roy Appleby. The Respondent had served as closing agent for the transaction and, after the closing, Mr. Appleby informed Ms. Goodman that the deed involved had not been recorded. Ms. Goodman phoned the Respondent to ask whether he had recorded the deed. The Respondent informed Ms. Goodman that he had recorded the instrument that day. When Ms. Goodman contacted the relevant county clerk, however, she learned that the deed had not yet been recorded. Ms. Goodman then immediately called the Respondent, who had since left his office. The Respondent's secretary informed Ms. Goodman that Mr. Battistelli had just left the office to go and record the deed. As a result of this dishonesty, the Respondent was charged with violating Rules 8.1(a) and 8.4(c) of the West Virginia Rules of Professional Conduct.[5]

The second complaint before the Hearing Panel (I.D. 91–03–155) charges that Mr. Battistelli misled and lied to former Disciplinary Counsel Maria Potter. The Respondent allegedly told Ms. Potter that he had, or would, make refund payments to a client by certain specified dates. The Respondent was retained by a criminal defendant, Gaylord Morris, to file a writ of habeas corpus on Mr. Morris' behalf and to also file a legal malpractice action against his former attorney. The Respondent took a $25,000 retainer from Mr. Morris to achieve those ends ($10,000 for the habeas matter and $15,000 for the malpractice action).

While the writ was filed and denied, the malpractice action was never pursued. Following the commencement of an investigation, the Respondent ultimately agreed to return the $15,000 malpractice retainer. Thereafter, the Respondent (1) told disciplinary counsel on repeated occasions of dates that he would pay back the $15,000; and (2) only ultimately paid $10,000 of the amount due. In sum, the Respondent knowingly failed to follow through on his repeated promises. It also appears that he attempted to mislead disciplinary counsel in this regard by faxing her a copy of a check that he purportedly sent to Mr. Morris when, in fact, the check was never sent. The Respondent's dishonesty resulted in alleged violations of

4. The factual scenarios in several of the complaints in the record on the date this case was submitted have been subsequently developed in the Statement of Charges. As a result, the primary violations of the Rules of Professional Conduct which were alleged in the Petition have now been expanded to allege further violations. We think it best to consider only the alleged primary violations of record on the date of submission or, in some cases, violations clearly arising from the facts alleged at the time of submission, in determining whether to invoke Disciplinary Rule 3.27. Likewise, we have not considered the complaints and accompanying charges that were, in our opinion, either not fully developed at the time of submission or which first appeared in the subsequent Statement of Charges.

5. Rule 8.1 provides in pertinent part that "a lawyer in connection with a . . . disciplinary matter, shall not: (a) knowingly make a false statement of material fact[.]" W.Va.R.Prof.Cond. 8.1(a). Rule 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct

involving dishonesty, fraud, deceit or misrepresentation[.]" *Id.* 8.4(c).

It appears that the Respondent was also cautioned during the Appleby matter about taking client loans. The Petitioner originally asserted that the Respondent violated Rule 1.8(a) during the Appleby matter by requesting and receiving a loan from Mr. Appleby. Mr. Appleby stated that he made the loan because he was afraid the deed from the transaction would not be recorded if he did not comply. The Petitioner contends that the Respondent admitted to her that he requested the loan. The Respondent, however, argued primarily that since Mr. Appleby was not technically his client, Rule 1.8(a) did not apply. The Petitioner appears to have dropped this aspect of the Appleby affair, given that it did not appear in the charges before the Hearing Panel nor in the later Statement of Charges filed with the Court on November 18, 1994. Accordingly, we do not address the matter herein.

Rules 8.1(b) and 8.4(c).[6] Given his default in returning the full $15,000, the Respondent was also charged with failing to completely refund the unearned portion of a legal fee under Rule 1.16(d).[7]

In the third complaint presently before the Hearing Panel (I.D. 93–03–446), the Respondent is charged with a stunning number of derelictions in conjunction with his failure to prosecute legal matters for Ariel Fauley and her husband and his failure to respond to these clients' requests for information on the status of their cases. The Respondent admits that he is at fault for failing to respond to the requests for information. He is also charged in this pending matter with making certain misstatements and omissions to opposing counsel. For instance, after several rescheduling efforts by the Respondent, Mr. Battistelli finally settled on a date certain for the depositions of his clients by opposing counsel. When the date of the deposition arrived, however, neither the Respondent nor his clients appeared, and opposing counsel consequently made an unnecessary trip to West Virginia from Virginia. As a result of his alleged misconduct in this case, the Respondent was charged with numerous rule violations. Nevertheless, the gravamen of the matter appears to rest on violations of Rules 1.4(a) and 4.1(a).[8]

Six of the remaining complaints, which were still under investigation at the time of submission, charge that the Respondent asked certain clients to loan him money in violation of Rule 1.8(a).[9] According to an affidavit from Ms. Goodman, it appears that the Respondent was warned as early as late 1993 about pestering clients for loans. Ms. Goodman avers as follows:

5. She explained to Mr. Battistelli that it was improper to transact business with a client unless the safeguards set forth in Rule 1.8(a) of the Rules of Professional Conduct were followed. She also told him about the case of *Committee on Legal Ethics v. Simmons*, [184 W.Va. 183, 399 S.E.2d 894 (1990) ] in which a lawyer's law license had been suspended, in part, for borrrowing [sic] money from clients. She strongly urged Mr. Battistelli to quit asking clients or anyone to whom he owed a fiduciary duty for loans. Mr. Battistelli agreed to cease this behavior.

The first loan complaint (I.D. 94–03–422) alleges that on August 1, 1994, Mr. Battistelli spoke by telephone with an Ernest Burwell whom he was representing on a DUI charge. During the conversation, the Respondent allegedly explained that he had had difficulties with the IRS but that he had worked out an agreement to pay his arrearages on a monthly basis. He explained to Mr. Burwell that he did not have the payment that was due, and he asked that Mr. Burwell lend him $2,000. Mr. Burwell told the Respondent that he could lend him only $1,000. He immediately sent the check via Federal Express at the Respondent's request. Mr. Burwell apparently loaned the money to the Respondent because he was afraid his failure

6. Rule 8.1(b) provides, in pertinent part, that "a lawyer in connection with a ... disciplinary matter, shall not: (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter...." W.Va. R.Prof.Cond. 8.1(b).

7. Rule 1.16(d) provides, in pertinent part, that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as ... refunding any advance payment of fee that has not been earned." W.Va.R.Prof.Cond. 1.16(d).

8. Rule 1.4(a) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." W.Va.R.Prof.Cond. 1.4(a). Rule 4.1(a) provides that "[i]n the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person[.]" *Id.* 4.1(a).

9. Rule 1.8(a) provides as follows:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto. W.Va.R.Prof.Cond. 1.8(a).

to do so would result in inadequate representation.[10]

The Respondent admits that he borrowed the money, but asserts that this matter was resolved, following the filing of the Petition, to Mr. Burwell's satisfaction. He further states that Mr. Burwell's current attorney has advised him that the matter is basically closed. The Petitioner's reply, however, asserts that there is no evidence that anyone wishes to withdraw the pending complaint. Further, the Petitioner contacted Mr. Burwell's attorney after the Respondent filed his response to the Petition, and the lawyer allegedly stated, inter alia, that he told the Respondent that Mr. Burwell was not happy about either the representation he received or the loan request. The attorney also informed the Respondent that Mr. Burwell would testify against him if called to do so by the Petitioner.

In the second loan complaint (I.D. 94–03–236), it is claimed that the Respondent made a $15,000 loan request to Robert Anderson, whom the Respondent was representing in a sexual harassment suit. Mr. Anderson apparently made the loan, and in exchange the Respondent agreed (1) to invest in a gas well that belonged to Mr. Anderson, and (2) to reduce his fee for the sexual harassment suit. A written agreement was entered into to this effect, but the agreement was apparently breached when the Respondent did not pay back the loan according to the terms agreed upon. In fact, on the date the Petition was filed, it appears that the loan was still $7,500 in arrears.

The Respondent counters that he has now paid off the loan and that the matter has been resolved in a manner satisfactory to the client. The Petitioner's reply notes that while Mr. Anderson did indeed send a letter designed to withdraw the complaint, it was patterned after a form letter that was prepared and provided by the Respondent. The Petitioner also notes that the loan was not paid off until after the filing of the Petition.

In the third pending matter involving client loans (I.D. 94–03–368), the Respondent agreed to represent Shirley Coss in a personal injury case in 1991. Ms. Coss gave the Respondent a $2,000 retainer to represent her, and in September 1993 he asked her for an additional $2,000 for fees and expenses. He said he would refund the $2,000 if the case did not go to trial, but when the dispute settled in December 1993, the Respondent said he could only refund $1,500 and would do so by January 10, 1994. At the same time, he asked Ms. Coss for a loan and also asked her to contact her family to see if they would lend him money. No loan was given, however, and as of the date of submission, Ms. Coss had apparently not received her $1,500.[11] Further, at the time the Petition was filed, Ms. Coss had apparently been unable to contact the Respondent.

The Respondent asserts that he repaid the money to Ms. Coss subsequent to the filing of the Petition. This appears to be an out-

---

10. The Petitioner has documented the Burwell loan by submitting an affidavit from Bar Counsel and by submitting a copy of a $1,000 cashier's check payable to Mr. Battistelli with the notation "Ernest A. Burwell Loan to Geary [Battistelli]."
Apart from the improper loan, the Respondent appears to have acted in derelict fashion in representing Mr. Burwell. For instance, a member of the Petitioner's staff states via affidavit as follows: (1) that she received a call from a circuit judge informing her that the Respondent had failed to show up for Mr. Burwell's first offense DUI hearing before a magistrate; (2) that when she contacted Mr. Burwell, she was informed, inter alia, (a) that he paid the Respondent $750 to represent him in the matter; (b) that Respondent told him not to worry about the case because he had a relative in the prosecutor's office; and (c) that Respondent set up a meeting time with Mr. Burwell prior to the hearing on the matter, but never showed up for the hearing or the meeting. The Respondent counters: (1) that the failure to appear was inadvertent and does not rise to the level of a violation of the Rules of Professional Conduct; (2) that he did not attend the magistrate court hearing because he was preparing for trial in another case and inadvertently forgot about the Burwell matter; and (3) that he did not say that a relative worked in the prosecutor's office, but rather an old associate. The Respondent asserts he thought the matter could be worked out because of the circumstances of the case and not by improper influence with the prosecutor.

11. The Statement of Charges filed on November 18, 1994, alleges that when the Respondent finally did write Ms. Coss a check, it bounced. It appears now, however, that the Respondent has made good on the check.

right misrepresentation to the Court. Prior to filing its reply, the Petitioner contacted Ms. Coss. When asked whether the money had been repaid, Ms. Coss advised that it had not.

In the fourth client loan complaint (I.D. 92–01–295), it is charged that on March 6, 1992, Mr. Battistelli requested that client Rosemary Haught loan him $2,500 to pay back taxes. As an apparent alternative, he asked her to co-sign a bank loan. Ms. Haught refused to do either and terminated her relationship with the Respondent on March 10, 1992.[12] At that time, she asked the Respondent for an accounting of her $2,000 retainer and a refund of the unused portion. She allegedly stated that she could no longer "trust ... [the Respondent] to tell the truth." It is alleged that up to the time of the Petition, the Respondent had failed to (1) provide the requested accounting, or (2) fully refund the unearned portion of Ms. Haught's fee.

The Respondent counters that the conduct complained of occurred months ago. He also asserts that following the filing of the Petition, the matter has been resolved to Ms. Haught's satisfaction, and she has informed the Petitioner of such. This again appears to be a misrepresentation to the Court. The Petitioner's reply brief states that there is no information indicating that Ms. Haught wishes to withdraw her complaint. In fact, the Petitioner apparently contacted Ms. Haught in the course of preparing the reply brief and learned that she still wished to pursue her complaint.

In the fifth client loan complaint (I.D. 94–03–202), the Respondent is charged with borrowing $400 from clients Terry and Anise Kiger in 1992. Mr. Kiger initially refused to loan the money, telling the Respondent that he had bills of his own to pay. Mr. Kiger reluctantly acceded to the request, however, when the Respondent gave him a post-dated check to cover the loaned amount, which is attached as an exhibit to the reply brief. When Mr. Kiger attempted to cash the check on the indicated date, however, it bounced. The Respondent ultimately honored the check, but then made two additional loan requests of the Kigers in December 1992 and March 1993.

In the sixth client loan complaint (I.D. 94–03–404), Karen Rychlewski alleges that the Respondent borrowed the following amounts from her: (1) May to November 1993—$1,000; (2) November 1993—$5000; (3) January to March 1994—$10,500. As of the date of the reply brief, the Respondent had only repaid $1,200 of the $16,500 outstanding. Ms. Rychlewski has filed suit against the Respondent in an effort to recover the money.[13]

12. In its reply brief, the Petitioner details the extreme and desperate measures that the Respondent allegedly undertook to secure the desired loan. When Ms. Haught refused to loan the Respondent money, he allegedly phoned her bank. The Respondent purportedly (1) told a bank representative that Ms. Haught owed him money, (2) wanted to know if her credit was good, and (3) wanted to know if the bank would loan her the money to pay him. Even though the representative asserted that he did not want to discuss the matter, the Respondent persisted. The Respondent also allegedly told the representative that he would be willing to co-sign for the loan and pick-up the documents for Ms. Haught to sign. When the representative again refused, the Respondent asked the representative to loan the Respondent himself money to pay taxes. When the representative called Ms. Haught, who was surprised at this turn of events, she allegedly stated that she did not owe the Respondent any money and would not loan him any. When the representative confronted the Respondent about this later, he allegedly changed his story and said that Ms. Haught would owe him money as the case progressed. The Respondent has filed a reply to these charges, stating, inter alia, that Ms. Haught gave him permission to call the bank.

13. Apart from the pending client loan cases discussed above, two other complaints were also filed against the Respondent and were under investigation at the time of submission. The complaints discussed previously herein provide ample justification for the extraordinary procedures outlined in Disciplinary Rule 3.27. Accordingly, we need not dwell extensively on the two remaining charges. The first complaint (I.D. No. 93–01–047), charges the Respondent (1) with the unauthorized practice of law in Ohio, and (2) with conditioning his agreement to settle a pending civil action on the other party's agreeing to withdraw an ethics complaint. While there is some suggestion that the complainant withdrew the complaint via a signed form letter prepared by the Respondent, the Petitioner asserts that it has yet to receive the withdrawal letter.

In the second complaint (I.D. 94–03–369), the Respondent is simply charged with "neglect of legal matters and failure to keep clients reason-

The Petitioner asserts that the conduct outlined above indicates that the Respondent has committed numerous violations of the Rules of Professional Conduct and that he poses a substantial threat of irreparable harm to the public. Consequently, the Petitioner requests that we temporarily suspend the Respondent's law license until the underlying disciplinary proceedings are concluded. For the reasons set forth below, we grant the Petition.

### III.

■ This case presents the first opportunity for the Court to examine the emergency temporary suspension provision of the West Virginia Rules of Lawyer Disciplinary Procedure, which became effective on July 1, 1994. The relevant provision is set forth below:

> **Rule 3.27.** *Extraordinary Proceedings.*
> (a) Upon receipt of sufficient evidence demonstrating that a lawyer (1) has committed a violation of the Rules of Professional Conduct or is under a disability and (2) poses a substantial threat of irreparable harm to the public, the Office of Disciplinary Counsel shall conduct an immediate investigation.
>
> (b) Upon completion of such investigation, the Office of Disciplinary Counsel shall promptly file a report with the Supreme Court of Appeals indicating whether, in the opinion of Disciplinary Counsel, the lawyer's commission of a violation of the Rules of Professional Conduct or disability poses a substantial threat of irreparable harm to the public. The Office of Disciplinary Counsel shall attempt to provide reasonable notice to the lawyer prior to the filing of this report.
>
> (c) Upon receipt of this report, the Supreme Court, upon determining the existence of good cause, shall provide notice of the charges to the lawyer with the right to a hearing in not less than thirty days before the Court. The Supreme Court may appoint a trustee to protect the interest of the lawyer's clients during the pen-

dency of these proceedings. After such hearing, the Supreme Court may temporary [sic] suspend the lawyer or may order such other action as it deems appropriate until underlying disciplinary proceedings before the Lawyer Disciplinary Board have been completed.

W.Va.R.Law.Disc.P. 3.27.

■ We initially note the title of the Rule: "*Extraordinary* Proceedings." *Id.* (emphasis added). The special procedures outlined in Disciplinary Rule 3.27, therefore, should only be utilized in the most extreme cases of lawyer misconduct. Further, when the Office of Disciplinary Counsel has obtained sufficient evidence to warrant the extraordinary measures contained in Disciplinary Rule 3.27, its petition to this Court should contain, at a minimum, specific allegations of the misconduct alleged. Where necessary to aid the Court in its resolution of the matter, the petition should also refer to supporting documentation and affidavits. The respondent lawyer should then offer supporting documents and affidavits to counter the petition's allegations.

■ If the Court, after proceeding in accordance with Disciplinary Rule 3.27(c), concludes that the respondent lawyer should be temporarily suspended, it will so order. The Office of Disciplinary Counsel, however, must then expedite the resolution of the charges against the respondent and move to conclude the matter within ninety days after the suspension becomes effective. Given the practical difficulty of providing specific guidance on the instances where a temporary suspension is appropriate, the Court will apply the two-part standard in Disciplinary Rule 3.27 to each petition on a case-by-case basis. Accordingly, we will examine the instant Petition to determine whether there is sufficient evidence to conclude that the Respondent (1) has committed a violation of the Rules of Professional Conduct, and (2) poses

---

ably informed about the status of their cases in violation of Rules 1.3 and 1.4(a) of the Rules of Professional Conduct." The Statement of Charges explains this matter further. In sum, it

appears that the Respondent allegedly mishandled and neglected two civil actions that a client had entrusted to him.

a substantial threat of irreparable harm to the public.[14]

Based upon the facts set forth previously, we have little difficulty in concluding that there is sufficient evidence to initially demonstrate that the Respondent has violated numerous provisions of the Rules of Professional Conduct. For instance, we would note the three matters pending before the Hearing Panel. While there is sufficient evidence of more than one violation of the Rules alleged in each pending matter before the Panel, we find the purported violations of Rules 8.4(c) and 4.1(a) to be particularly noteworthy. As we observed in *Committee on Legal Ethics v. Ikner*, 190 W.Va. 433, 438 S.E.2d 613 (1993), "[c]ritical traits of a lawyer's character are honor and integrity." *Id.* at 437, 438 S.E.2d at 617. The record contains ample evidence that the Respondent acted dishonestly and deceitfully toward disciplinary counsel in the Appleby and Morris matters. We further find adequate proof that the Respondent violated Rule 4.1(a) in his dealings with opposing counsel in the Fauley matter. Our conclusion in this regard is certainly influenced by (1) the Respondent's failure to adequately address these three charges in his response brief, and (2) the misrepresentations about certain matters that he has made to this Court in his brief.

■ Second, we note the six client loan cases. The record on these matters reveals violations of either Rule 1.8(a) or other Rules. In the Burwell, Anderson, Kiger and Rychlewski matters, there is more than sufficient evidence to indicate that the clients loaned money to the Respondent on unfair terms. While we have considered the Respondent's arguments to the contrary, the loans clearly contravened Rule 1.8(a). The gravity of taking unfair loans from clients is well-stated in the following excerpt:

Polonius' advice to Laertes: "Neither a borrower nor a lender be," was good advice in Shakespeare's day, and is good advice today. Attorneys would be well advised to take heed of the admonition, for the instances of disciplinary actions against attorneys for borrowing from their clients are legion, and, because of the inherent possibility of conflict of interest, such transactions are always closely scrutinized for any unfairness on the attorney's part.

Jane Massey Draper, B.C.L., Annotation, *Disciplinary Action Against Attorney Taking Loan From Client*, 9 A.L.R. 5th 193, 209–10 (1993) (footnote omitted).

■ The commentary to Rule 1.8(a) similarly provides that "[a]s a general principle, all transactions between client and lawyer should be fair and reasonable to the client." W.Va.R.Prof.Cond. 1.8(a) cmt. Indeed, we would observe that fairness to the client is the touchstone of Rule 1.8(a). As a general matter, we find the Supreme Court of New Jersey's observations in *In re Youmans*, 118 N.J. 622, 573 A.2d 899 (1990) to have particular application to the lawyer's duty of fairness to his client in loan transactions. In *Youmans*, the respondent solicited and obtained unsecured loans from clients when, like the Respondent herein, "his ability to repay those loans was seriously in doubt." *Id.* at 633, 573 A.2d at 906. The court commented as follows:

"An attorney who enters into business ventures with his client does not, in the eyes of his client or the public generally, shed in chameleon fashion his professional standing and obligation * * *." *In re Carlsen*, 17 N.J. 338, 346, 111 A.2d 393 (1955). Thus, it is clear that attorneys who enter into loan transactions with clients are "held to a higher standard than that of the mar-

---

14. We note as an initial matter that the Respondent appears to raise a due process challenge to the instant proceedings. In *Committee on Legal Ethics v. Ikner*, 190 W.Va. 433, 438 S.E.2d 613 (1993), we noted that Disciplinary Rule 3.27 had been approved for comment, but had yet to become effective. *Id.* at 437, 438 S.E.2d at 617 n. 3. Nevertheless, we utilized the Rule 3.27 standard to impose a temporary suspension on the respondent lawyer. *Id.* at 438, 438 S.E.2d at 618. While the respondent in *Ikner* raised the issue of due process, we suggested that due process was satisfied by the Disciplinary Rule 3.27(c) provisions for notice and an opportunity to be heard. *Id.* at 437–38, 438 S.E.2d at 617–18. In this case, consistent with Disciplinary Rule 3.27(c), the Court provided the Respondent with an opportunity to appear for a hearing and to file a brief responding to the allegations made. We therefore conclude that he received all of the process that was due.

ket place * * * [and their] conduct must measure up to the high standards required of a member of the bar even if [their] duties in a particular transaction do not involve the practice of law." *In re Reiss,* 101 N.J. 475, 488, 502 A.2d 560 (1986). *Id.* at 633–34, 573 A.2d at 906–07.

In relation to the four clients who loaned money to the Respondent (Burwell, Anderson, Kiger and Rychlewski), we find that he (1) never advised them that they should consult an attorney prior to entering the transaction; (2) never allowed them a reasonable opportunity to consult an attorney about the transaction; and (3) never completely advised the clients of the full extent of his indebtedness. To add insult to injury, *all* of the loans were unsecured. As a result, the Respondent's loan transactions failed the first and most important test of Rule 1.8(a): the transactions were anything but "fair and reasonable to the client." W.Va.R.Prof. Cond. 1.8(a)(1). Accordingly, we conclude that the Respondent violated Rule 1.8(a) with respect to the client loans.[15]

The Respondent's substantial threat of irreparable harm to the public is equally clear cut. First, like Rosemary Haught, this Court and the public can no longer "trust . . . [the Respondent] to tell the truth." The Respondent's pattern of deceitful activity jeopardizes the relationship with his clients and their ultimate success in pending litigation. Further, and more importantly, his continuing dishonesty in this Court and perhaps other tribunals affects the appropriate administration of justice. His activity has also worked serious harm on the profession. For instance, the Petitioner notes an October 1994 conversation with Ms. Rychlewski in which the client indicated that she no longer had faith in *any* lawyer.

Second, the Respondent refuses to recognize the wrongfulness of engaging in unfair loan transactions with his clients. At least as early as late 1993, the Respondent was warned by disciplinary counsel that it was improper to solicit and take client loans unless the Rule 1.8(a) safeguards were satisfied. Just over one week later though, the Respondent borrowed $5,000 from Ms. Rychlewski. According to the record, he appears to have continued soliciting and receiving unfair loans from clients at least through August 1994. We are unwilling to let the pattern continue.[16]

Accordingly, we hereby grant the Petition and temporarily suspend the Respondent's law license until the underlying disciplinary proceedings against him have concluded. The Petitioner, however, is directed to hold hearings on, or otherwise dispose of, the pending matters no later than July 1, 1995, absent any reasonable requests for continuances by the Respondent.

Relief ordered.

BROTHERTON, J., did not participate.

MILLER, J., sitting by temporary assignment.

---

**15.** In regard to the Haught and Coss matters, the Respondent appears to argue that since no actual loan took place, no violation of Rule 1.8(a) occurred. Even assuming that the Respondent's conduct did not technically amount to a violation of Rule 1.8(a), there is sufficient evidence to indicate that his failure to promptly return the advanced fees and expenses to the two complainants violates Rule 1.16(d). Further, and more importantly, the Respondent's outright misrepresentations to this Court concerning (1) his repayment of Ms. Coss, and (2) his suggestion that the dispute between he and Ms. Haught had been resolved clearly violates Rule 3.3(a)(1) concerning truthfulness to the court. Rule 3.3(a)(1) provides that "[a] lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal[.]" W.Va.R.Prof.Cond. 3.3(a)(1). The Respondent's misrepresentations to this Court are quite troublesome, given that he was disciplined for similar misconduct previously. *See supra* note 2.

**16.** While we have not discussed it fully herein, the record also indicates that the Respondent has a storied history for neglecting and mishandling client matters. Like the misconduct set forth above, he has been previously warned to avoid this type of wrongdoing. *See supra* note 2.